Millie **GEORGE**, Plaintiff,

v.

Anthony **FRANK**, Postmaster General, Defendant.

No. 86 Civ. 6949 (BN).

United States District Court, S.D. New York.

March 27, 1991.

Miller, Hochman, Meyerson & Schwartz (Otto J. Scerbo, of counsel), Jersey City, N.J., for plaintiff.

Otto G. Obermaier, U.S. Atty., for the Southern District of New York (Paula T. Dow and Nancy Kilson, Asst. U.S. Attys., of counsel), New York City, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting as a United States District Court Judge by designation:

### INTRODUCTION

Millie George ("George"), a black female employee of the United States Postal Service, brings this action under Title VII of the Civil Rights Act of 1964, § 701, 78 Stat. 253, as amended, 42 U.S.C. § 2000e, *et seq.*, against Postmaster General Anthony Frank ("Postmaster General" or "defendant") alleging discriminatory employment practices by employees of the Postal Service against George on the basis of gender. George predicates the court's jurisdiction on Title VII, § 706, 78 Stat. 259, as amended 42 U.S.C. § 2000e–5.

Based on a claim of disparate treatment, George seeks monetary damages for allegedly resultant work-related physical and psychological personal injuries caused by defendant's gender discrimination: (1) compensatory damages for lost wages and income for the period 1985–1989 amounting to $165,000.00; (2) punitive damages; and

(3) medical expenses for related health problems in the sum of $1,250.00.

Defendant requests dismissal of the action arguing: (1) that the court lacks subject matter jurisdiction under Title VII insofar as George seeks recovery of damages for work-related personal injuries, for the reason that her exclusive remedy for such monetary awards falls within the scope of the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101, *et seq.;* (2) alternatively that, assuming that the court possesses subject matter jurisdiction over George's damages claims, defendant denies liability under Title VII for any alleged disparate treatment of George respecting similarly situated employees; (3) and that even if George prevails on her substantive gender discrimination claim, Title VII precludes George from recovering compensatory and punitive damages.

After careful review of the lengthy transcript of the testimony adduced at a five-day bench trial, the exhibits in the record supplemented by the parties' proposed post-trial findings of fact and conclusions of law, the court holds: (1) that George's claim to recover money damages under Title VII for personal injuries incurred during her postal employment is not foreclosed by FECA; (2) that George did not sustain her burden of proving, by a preponderance of the evidence, that defendant intentionally discriminated against George because of her gender; and (3) that the court need not reach George's damages, since George failed to establish defendant's liability. In accordance with Rule 52(a), Fed.R.Civ.P., the court makes the following Findings of Fact and Conclusions of Law:

## JURISDICTION

■ The court first addresses the post-trial objection raised by the Postmaster General which suggests that this court lacks subject matter jurisdiction under Title VII to award George the monetary relief she seeks, allegedly for personal injuries sustained during her postal employment. The Postmaster General argues, unconvincingly, that FECA provides George's sole remedy as a federal employee on a claim seeking money damages for work-related personal injuries, and thus the Court lacks jurisdiction to award George damages until George's claim has been presented, and rejected by, the Federal Employees' Compensation Board.

Congress enacted FECA to provide worker's compensation benefits for federal employees who sustain injuries in the course of their employment. Under FECA, federal government employees, including employees of the United States Postal Service, are entitled to compensation for wages lost and medical costs incurred due to such work-related injuries. 5 U.S.C. §§ 8102(a), 8103(a), 8105, 8106. Indeed, FECA provides that when a plaintiff seeks to recover damages "the liability of the United States or an instrumentality thereof with respect to the injury or death of an employee [while in the performance of his duty] is exclusive." 5 U.S.C. § 8116(c).

The provisions of Title VII prohibit all employers within the public and private sector from committing unlawful discrimination against their employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2. Postal Service employees are specifically included under 42 U.S.C. § 2000e–16, and are entitled to the following remedial relief:

> the court may enjoin the [employer] from engaging in [an] unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees with or without back pay ..., *or any other equitable relief as the court deems appropriate.*

42 U.S.C. § 2000e–5(g), (emphasis supplied).

The question of whether or not to foreclose judicial review of a suit brought by a federal employee under Title VII's employment discrimination statutes on account of overriding FECA coverage has not been squarely addressed in the Second Circuit. Courts in other jurisdictions, however, provide instructive guidance for the resolution of this thorny issue.

One particularly fruitful discussion appears in a decision rendered by the Third Circuit, *Miller v. Bolger*, 802 F.2d 660 (3d Cir.1986). In *Miller*, plaintiff sought compensation under Title VII for work-related injuries despite the fact that he had already received benefits under FECA for some of those injuries. *Id.* at 661. The court acknowledged that FECA § 8116(c) sets forth exclusive boundaries concerning injury or death of employees intending to "limit the employee's right to pursue certain other avenues for obtaining compensation from the United States." *Id.* at 662.

Concentrating on the statutory framework and legislative history of FECA, however, the court determined that "the language of § 8116(c) specifically refers to the alternative remedies under a workmen's compensation statute or under a Federal tort liability statute," and that Congress only intended FECA to be "a substitute for suits against the United States for tortious injury as authorized by statutes similar to the Federal Tort Claims Act." *Id.* at 663. Thus, concluding that FECA's exclusivity provisions do not preclude a recovery under Title VII for the reason that Congress did not mention FECA's exclusivity when it made Title VII applicable to federal employees in 1972, *Id.* at 663–64, the court ultimately held that FECA does not pose a bar to recovery of full compensation for Title VII injuries, as long as the plaintiff is not awarded a double recovery. *Id.* at 665–66.

The court's approach in *Miller* was recently followed by the District Court in Oregon in *Nichols v. Frank*, 732 F.Supp. 1085 (D.Or.1990). The plaintiff in *Nichols* alleged "quid pro quo" or "hostile environment" sexual harassment under Title VII and sought additional monetary relief over and above her award of prior FECA benefits. The Postal Service responded that the action was moot due to the lack of an available monetary remedy under Title VII, for the reason that FECA payments are the exclusive source of compensation awardable under such circumstances.

Interestingly, as defendant does now in its post-trial brief, it directed the *Nichols* court to three decisions to support its contention, *Black v. Frank*, 730 F.Supp. 1087 (S.D.Ala.1990), and two unpublished opinions which were printed as appendices to the *Black* opinion. Citing a failure of precedential or persuasive value for the reason that the opinions addressed claims brought under the Rehabilitation Act of 1973, 29 U.S.C. § 791, rather than Title VII employment discrimination, the court rejected defendant's argument and permitted plaintiff's recovery of back pay under Title VII to the extent that the back pay sought fell short of a double recovery respecting earlier FECA payments.

The court agrees with the *Nichols* court in finding a lack of merit in defendant's reliance on *Black*, or the unpublished opinions appearing as appendices thereto. More, defendant misses the mark with the other supporting non-Title VII cases cited in its post-trial brief. The short of the matter: the genesis of this litigation centers on Title VII gender discrimination which according to the reasoning in *Miller* and its progeny is not limited to remedies such as reinstatement and back pay, and may include such items as front pay, medical expenses and attorney's fees. The question as to FECA coverage, which is most commonly associated with work-related accidents and diseases, clearly fails to preclude George's request to pursue her *discrimination* claim under the umbrella of equitable remedies available under Title VII; simply because the plaintiff in this action seeks money damages there is no reason to foreclose her Title VII action. Accordingly, the court holds that George may seek money damages for disparate treatment in connection with a Title VII gender discrimination theory.

## FINDINGS OF FACT

*Employment at Morgan General Mail Facility*

George first obtained employment with the Postal Service as a Postal Police Officer ("PPO") in New York City on January 4, 1974. She was promoted to sergeant on February 6, 1981 and transferred to the General Post Office, Morgan General Mail

Facility ("Morgan GMF") in New York City as a Security Supervisor. The responsibilities attendant with George's promotion to Security Supervisor at the Morgan GMF included directly overseeing the PPO's who are assigned to provide security for approximately five post office branches in the borough of Manhattan.

Specifically, George was assigned to Tour III, the 11:30 p.m. to 8:00 a.m. shift, and was required to hire, train, motivate, discipline and sometimes fire the 58 PPO's that comprised Tour III's segment of the Postal Police Force. Three additional Security Supervisors usually worked concurrently with George during Tour III so at any one time George was responsible for directing approximately 15–20 PPO's. The individuals assigned to Tour III with George were sergeants Burke, Green and Jenkins. George was the only female Security Supervisor at Morgan GMF.

One lieutenant supervised the sergeants and directed the tour and its operations. The lieutenant in turn reported to a Security Officer In Charge ("SOIC") who oversaw the overall operations of security at the main post office and four or five smaller facilities in Manhattan. When George was first transferred to Morgan GMF lieutenant William Moir ("Moir") was her immediate supervisor but lieutenant Robert Warren ("Warren") replaced Moir in July 1982. The SOIC during the majority of the period George worked at Morgan GMF was Jack Scalici ("Scalici").

*Allegations of Discrimination*

*Facilities and Equipment*

George contends that following her promotion to sergeant she was not given equal training opportunities. She testified that the Postal Service failed to train George after her promotion to sergeant whereas a male sergeant promoted subsequently to George received two weeks of on-the-job training before his assignment to a particular tour. But Jenkins, who was promoted to sergeant concurrently with George, testified that both he and George attended the same one-week training course, and George admitted during cross-examination that she attended this program (Tr. 78).

Upon meeting George for the first time, Scalici recalled that George "took offense" because the Postal Service did not situate her in a locker room separated from her female underlings, unlike her male counterparts who changed in separate locker rooms apart from their subordinates. Shortly thereafter, George also demanded provision of a separate "swing room," a large area with tables shared by the other supervisors and utilized to take "breaks," eat their lunch and perform paperwork duties. Alternatively, George suggested that the Postal Service provide her with the use of a separate combination locker room/swing room, in essence, her own office (Tr. 38–40).

Respecting changing areas, Scalici explained that there were no separate facilities available at Morgan GMF apart from the existing female locker room to accommodate George who was the only person who would be utilizing such a space (Tr. 353). There were only eight female PPO's on the same tour as George. Thus, the locker room used by George was used by only nine individuals. The eight PPO's were assigned to posts and could only leave the posts during their "breaks" and lunch periods. The only possible times when the PPO's would even be in the locker room were when they changed clothes at the beginning and end of their tours and during their "breaks" and lunch periods. At other times, the female locker room was empty and George had it all to herself.

Regarding an area to work on reports and counsel PPO's, although George categorically denied receiving permission to use the existing supervisor's combination swing room/locker room shared by her male peers to complete paperwork, take breaks, eat lunch and change clothes, Warren and Jenkins both agreed that George was provided access to that facility. Despite the limited possibility for potentially awkward situations at the beginning and end of tours when supervisors changed clothes, the court finds that George could otherwise have made use of this option by simply knocking and inquiring whether or not a fellow male supervisor was changing

clothes before entering the area to complete her written reports. Also, Warren credibly testified that George was permitted to use the training room which was usually vacant, any of the inspector's offices which were available, or even Warren's own office which George in fact utilized on several occasions to counsel PPO's. Evidently, George was presented with viable alternatives besides the female PPO's swing room to work on PPO evaluations.

Additionally, George requested provision of a file cabinet during February, 1981 and alleges not being issued one until approximately three years later, in early 1984. The trial evidence established that when George requested a file cabinet from Scalici he shortly thereafter penned a note directing that George be provided the cabinet (pltf's exh. 7; Tr. 81), but Scalici could not recollect when the file cabinet was actually delivered. Warren stated that it was issued to George in early 1983 (Tr. 224). Even assuming the substantial delay alleged by George, there is no proof that Scalici failed to provide George with the cabinet because of her gender, and during the intervening period George was provided primary access to file cabinets in the command center which were available to all supervisors and, if necessary, access to a file cabinet in SOIC Scalici's office.

More, George argues she was denied a key to the fifth floor womens' lavatory facilities at Morgan GMF until a few days prior to her leaving the Postal Service, and thus claims she was effectively denied access to the lavatory facilities at Morgan GMF. George, however, admitted having access to the ladies' room on the work floor. The Postmaster General maintains that George received a key in June, 1983, conceding that its failure to provide a key at an earlier time was an administrative oversight. At trial, George admitted that the Postal Service did issue her a key by June, 1983, and failed to provide evidence that the defendant deliberately refused to issue George a lavatory key for purposes of sex discrimination.

## Supervisor Harassment

Despite alleging that gender discrimination existed from the onset of her promotion because of, *inter alia*, unequal facilities for changing clothing and for preparing and storing reports, George's more potent allegations regarding gender discrimination concern events transpiring subsequent to the time period Warren became George's direct supervisor. George testified that Warren began harassing her within one month following his July 1982 transfer to Morgan GMF. She testified that he repeatedly called her "bitch," "slut" and "cunt" (Tr. 43). In support, she emphasized that Warren was previously accused of using the word "bitch" towards another female while stationed at another post. As further examples of Warren's alleged harassment George testified that Warren would have her paged by the radio room to determine where she was located; that he would call staff meetings with the Tour III sergeants during which time Warren, sergeants Burke and Jenkins would "harass" George (Tr. 45–46); and that Warren improperly accused George of incorrectly performing her duties such as, not properly responding to an alarm bell, providing an improper staff report, and misdirecting a PPO.

Warren categorically denies ever referring to George as a "bitch," a "slut" or a "cunt" (Tr. 268), and it is uncontradicted that the prior unrelated charge concerning the use of the word "bitch" towards a female was resolved in Warren's favor (Tr. 271). Also, Warren credibly testified that it was his general practice to maintain periodic contact with his entire staff of sergeants respecting their locations throughout the day (Tr. 228).

Moreover, George's allegations of gender-based name calling or "harassment" during staff meetings are not persuasive. And both Warren and Jenkins corroborated that George was disruptive during meetings, appeared late, if at all, and generally refused to participate in topics discussed at the meetings. Further, the court finds that Warren's practice of periodically checking the location of his sergeants was

necessary and proper for purposes of a potential emergency, and not limited to George but rather applied to all the sergeants under Warren's supervision (Tr. 228).

Additionally, George's allegations of discrimination implicate Scalici. Claiming that Scalici implied sexual threats to her regarding her employment with the Postal Service, George testified that Scalici, while evaluating her performance, remarked that "if [she] played the game, that [she] would get evaluated appropriately" (Tr. 57, 90). George argues that Scalici was suggesting, by his comment, that she should "lay on her back" for the job (Tr. 58, 91). But on cross-examination George was evasive regarding her allegations of Scalici's improper sexual suggestions, and ultimately conceded that, in fact, nobody employed at the Postal Service, including Scalici, ever formally or informally made sexual overtures or caused George to feel sexually threatened on the job (Tr. 90–91).

George testified that as a direct result of such alleged harassment and discrimination she became ill, suffering from blood pressure problems and experiencing nose bleeds, diarrhea, and pains in the face and head (Tr. 65, 130). She sought the attention of Dr. Randolph Johnson ("Dr. Johnson") for treatment of an upset stomach and nervous condition and was required to take a number of prescriptions in 1984 and 1985 (pltf's exh. 9). George claims she was never reimbursed for her medical bills. Fearing a relapse of her physical ailments, George maintains that she can no longer work in any job involving a stressful situation.

*Expert Testimony: George*

██ In support of her condition George relies on the expert testimony of Dr. James Ferretti ("Dr. Ferretti").[1] George was evaluated by Dr. Ferretti and diagnosed as follows:

Dysthymic disorder, depression, with anxiety, tension, irritability, and psycho-somatic disorder (headache, gastrointestinal disturbance—in remission, intermittently elevated hypertension with epistaxis) (pltf's exh. 19).

Dr. Ferretti added that these symptoms "are causally related to the ongoing job stress as described by [George]" (*Id.*). He opined that George has a "dread of the Post Office which was even extant when she received a letter with a postmark. That was sufficient stimulus to cause anxiety since it reminded her of her [Postal Service] employment.... [Thus] based on a reasonable degree of medical probability ... this patient [George] cannot return to work at the Post Office" (Tr. 142, 147; pltf's exh. 19).

The credibility of Dr. Ferretti's expert opinion was substantially weakened on cross-examination. For example, he conceded that he did not have, and had not reviewed, any of George's medical or employment records when he rendered his opinion, and instead relied exclusively on George's own representations of her health problems and employment conditions (Tr. 152). More, Dr. Ferretti was unaware that George had been diagnosed as suffering from temporal arteritis, an inflammation of the blood vessels which can produce, among other symptoms, the headaches and facial pain which George attributed directly to her alleged sex discrimination.

Importantly, Dr. Ferretti conceded that all of the symptoms complained of by George may stem from non-work related problems, and he admitted that George could experience all of these psychosomatic ailments even if subjected to valid criticism by the Postal Service.

In sum, the court finds little merit in Dr. Ferretti's conclusion at trial, predicated upon his limited examination, that the cause of George's ailments was work-related discrimination, especially since he had no contact with any of George's supervisors or other co-workers, and failed to re-

**1.** Dr. Ferretti is currently Chairman, Department of Psychiatry at Christ Hospital in New Jersey, Medical Director of Christ Hospital Community Mental Health Center and Attending Psychiatrist at Bayonne Hospital. A certified member of the American Board of Psychiatry and Neurology since 1979, he is also a member of the American Medical Association, American Neuropsychiatric Association and Hudson County Medical Society (pltf's exh. 18).

view any of George's medical or employment records.

*Expert Testimony: Postmaster General*

Dr. Robert H. Berger ("Dr. Berger")[2] testified as an expert witness for the Postal Service. He examined George in March and May of 1990 for a total of three hours and, unlike Dr. Ferretti, Dr. Berger reviewed the pertinent written materials such as Dr. Ferretti's report, dated September 21, 1988, medical documentation submitted to the Postal Service by George and her treating medical physician, Dr. Johnson, the performance evaluations of George submitted by her supervisors, letters from the Postal Service to George concerning her grading and status as an employee, and deposition testimony given by George.

The credible evaluation submitted by Dr. Berger failed to reveal evidence that George suffered significant psychological or emotional distress in response to her work situation. Dr. Berger found that the symptoms George complained of, including, headaches and facial pain, anxiety, occasional sleeplessness, hypertension and gastrointestinal problems had no causal relationship to alleged supervisor harassment. Instead, he opined that two medical conditions—Temporal Arteritis, which George was diagnosed as suffering from, and Carcinoid Syndrome, which had been discussed and considered for diagnosis by her treating physician—specifically accounted for a majority of the symptoms (Tr. 453). In fact, Dr. Berger found no specific evidence to support the view that any of the symptoms, conditions or disorders were job related. Nor did he find any documentation supporting George's position that her physical symptoms were of a debilitating magnitude or that either psychological or physical symptoms persist (deft's exh. 60).

On the other hand, Dr. Berger reported that George personally experienced difficulty performing up to the standards of her position, and characterized George as exhibiting passive-aggressive, narcissistic and paranoid personality traits. Accordingly, she interpreted her supervisors' constructive criticism as a personal attack, and blamed her physical ailments on others who she considered responsible for creating stress on the job. And George defended her own acute vulnerability respecting failure by projecting blame and anger outward onto others who she pictured as criticizing her competency and employment performance. In the final analysis, Dr. Berger concluded that George preferred to "perceive" sexual discrimination rather than the possibility that she may not be performing up to the expectations of her supervisors and her own high expectations of herself.

*Supervisor's Assessment of George's Performance*

As a supervisor, Scalici described George as an aggressive type that interacted satisfactorily with her subordinates, a fact which is supported by the collective statement submitted on George's behalf by her subordinates (pltf's exh. 17). But Scalici stated that George was sorely deficient in maintaining smooth working relationships with her peers and/or superiors.

Nevertheless, despite observing that George was prone towards interpersonal conflict with her peers and superiors Scalici rated George as "good" on the first merit evaluation, dated August 25, 1981 which indicated George's performance as a Security Supervisor. Additionally, in early 1982 Moir evaluated George favorably although he noted that she was "not a good team worker" and remarked that "she [did] not display a spirit of cooperation." Stemming from the first two positive merit evaluations Scalici recommended that George receive a salary step increase. Warren replaced Moir as George's immediate supervisor shortly thereafter.

---

**2.** Dr. Berger is a psychiatrist specializing in the area of psychiatry and the law, known as Forensic Psychiatry. He is presently Deputy Director of New York University–Bellevue Forensic Psychiatry Services and Clinical Associate Professor of Psychiatry at the New York University School of Medicine. In that capacity, respectively, he evaluates individuals for a variety of clinical and criminal matters, and lectures medical students and psychiatric staff members in the area of psychiatry and the law. Dr. Berger's professional affiliations include the American Psychiatric Association and the American Academy of Psychiatry and the Law (deft's exh. 63).

Scalici's 1982 mid-year evaluation, although still generally favorable, noted that although George was trying hard she did not get along well with her fellow supervisors, always complaining about sarcastic harassment and criticism from her peers because of her gender; Scalici concluded that she "seem[ed] to be constantly on the defensive because she is a female" (deft's exh. 12).

According to Scalici, George's job performance deteriorated rapidly following the mid–1982 evaluation. George failed to submit timely reports concerning the PPO's she supervised, and when she did the evaluations appeared to be exactly alike despite referring to separate individuals (deft's exh. 11). Scalici was required to go through the evaluations individually to supplement relevant information. Furthermore, Scalici detailed one particularly glaring example of George's open disregard for correct procedure in which George was evaluating a PPO being considered for promotion to sergeant. Essentially, Scalici's undisputed assessment suggests that George provided the PPO's wife with the blank form and instructed her to complete the form using the same language as appeared on the prior evaluation George had submitted respecting that PPO. But George's response to any constructive criticism regarding her work performance, however, was characterized by Scalici as argumentative or expressive of hostility towards Scalici or a fellow supervisor.

Beginning in late 1982 Scalici remarked that George encountered employment performance problems with even greater frequency. On November 12, Scalici talked to George concerning her improper handling of a weapon, as reflected in an incident report prepared by George (deft's exh. 13). On December 7, George was counseled by Scalici for permitting a potentially intoxicated PPO to complete his tour carrying a loaded weapon. George claimed she was unsure whether the PPO was intoxicated, but proper procedure dictated that the PPO be sent to the Medical Unit to definitively evaluate his fitness for duty.

On April 23, 1983 Scalici corresponded with George informing her that she had utilized an improper form to fill out a hazard report. On May 12, Scalici noted in the file that George had demonstrated "indecisiveness," "a lack of knowledge of her job" and "poor judgment" by calling Scalici to intervene during an employee dispute involving a PPO under her direct command concerning whether a particular door should remain open or closed; Scalici explained that George should have known proper post conditions especially after a year and a half on the job (deft's exh. 23). And on September 8, Scalici counseled George about improperly responding, alone, to a situation involving an unruly employee without calling for assistance or radioing security headquarters.

Warren also noted examples of George's interpersonal difficulties and sub-par performance record. He acknowledged that tension existed between George and Jenkins from the very first sergeant's meeting that took place under his direction and recalled that the two exchanged words. Although Warren explained that George exhibited the most animosity towards Jenkins, Warren testified that generally George's desire to interact with her peers was minimal, and that her attitude was extremely distant (Tr. 225).

Respecting professional duties, Warren critiqued the manner in which George posted roll call assignments for PPO's under her supervision in that she rarely varied the rotations resulting in the same PPO's carrying out the same assignments. More, Warren commented that George exercised poor judgment by assigning unqualified PPO's to operate the National Crime Index, a specialized training duty for postal security personnel. Warren added that George was not at all receptive to attempts at counseling on the roll call issue. Finally, Warren detailed that George defied repeated reminders concerning her failure to oversee the proper disposition of the United States flag hanging outside Morgan GMF during the evenings and during poor weather.

On January 14, 1983, Warren informed Scalici that George had violated Warren's directive concerning the proper procedures for requesting sick leave by alerting the Control Center rather than a fellow supervisor. On November 13, Warren questioned George regarding inefficiency in the utilization of manpower. Evidently, George authorized overtime for a PPO, but Warren suggested several more efficient alternatives to insure the completion of the necessary tasks (deft's exh. 34).

### "Marginal" Merit Evaluations

Not surprisingly, Scalici's and Warren's merit evaluations reflected the marked downturn respecting George's job performance. The January 1983 merit evaluation prepared by Scalici rating George as "marginal", the lowest possible rating (pltf's exh. 5). Scalici rated George as marginal with regards to categories such as decision making, productivity in terms of thoroughness, promptness and quality of work, perceptivity, and flexibility. The evaluation detailed that George clashed with her colleagues, rebuked offers of assistance from fellow supervisors, and that "her overall attitude ha[d] created tension and discontent between her fellow supervisors and herself." In his comments supporting the evaluation Scalici remarked:

> Sergeant George is being given an overall evaluation of 'Marginal.' She has the potential of becoming a Very Good Supervisor. However, she has a 'chip' on her shoulder about being a woman, and this interferes with her work. For example, she has complained often that the other supervisor [sic] on her tour are trying to frame her, are making a fool of her, and 'give' her the 'shaft' because she is a female (pltf's exh. 5).

Scalici again rated George's job performance as "marginal" during her July 13, 1983 mid-year performance evaluation following a July 11 report from Warren to Scalici indicating that although George "[previously] created a problem by shirking responsibilities, showing a hostile attitude towards her peers and supervisors for no

apparent reason ... approximately a month ago I noticed positive signs of change. I have continued to offer my help. She now accepts some constructive criticism and is more cooperative with co workers" (jt. exh. 2).

After considering Warren's report Scalici determined that "[he hadn't] seen anything [himself] that indicates a change, except that [he was] not receiving complaints from the other supervisors" (jt. exh. 3). Therefore, relying upon his own observations of George's behavior during work hours and during the oral mid-year evaluation, Scalici prepared notes following the oral evaluation and concluded that George continued to project "a negative and hostile attitude towards everyone, including [him]self. She is surly and even lacks the social graces as far as extending greetings of goodbye to other supervisors" (*Id.*).

George argued that the poor mid-year evaluation was based upon the same gender discrimination that George was subjected to during her entire employment following her promotion to sergeant. As a direct result, on August 9, 1983, George filed an administrative complaint with the Equal Employment Opportunity Commission ("EEO Complaint") alleging that she was discriminated against based on sex when she received a poor 1983 mid-year evaluation[3].

Importantly, Warren's next evaluation for the quarter ending in October, 1983 reflected a "retrogression" in George's professional behavior and corroborated Scalici's negative July evaluation. Warren's evaluation outlined marked shortcomings respecting George's level of communicative interaction with peers, cooperation and response to criticism, quality of work, and a deterioration in her attendance record. Warren noted that George's excuse for the downturn in her performance was that she had been given a "marginal" evaluation on her merit; she refused to acknowledge that her actions may actually have caused the marginal evaluation, instead "accusing the

---

**3.** On January 2, 1986, the EEOC issued a final agency determination finding no gender discrimination and denying George's August 1983 administrative claim of discrimination.

tour and security force management in general of harassment" (deft's exh. 28).

On January 11, 1984, George received a third "marginal" rating from Scalici on her merit evaluation (deft's exh. 35). Shortly thereafter on January 19, Warren issued George a "marginal" on a performance evaluation (deft's exh. 3). Respectively, Scalici and Warren provided the following detailed comments in support of the marginal ratings:

*Scalici:*

Her work performance since the last evaluation has not improved and her attitude, if anything, has become worse. She still complains that the other supervisors are not cooperative and she creates tension among them, not only on her own tour, but amongst the supervisors from other tours. Sergeant George has been offered assistance by her peers and her supervisors, but she resents this ...

... She still displays only a fair knowledge of her duties ... Her judgement and discretion at times are very poor. She is not thorough in her work and very often her supervisor must follow up on her routine duties to see that she performs them ... (deft's exh. 35).

*Warren:*

Poor ability at organizing, planning and perceptivity in conjunction with weak job knowledge, analyzing problems or understanding instructions and poor communication skills makes Sergeant George an ineffective supervisor.

Responding negatively to all constructive criticism. Shirking responsibilities whenever possible. Using scapegoats to justify her poor performance, using a lot of unscheduled leave, often with prior knowledge of supervisor shortages on the tour.

Security Force management at all levels has made every effort to help Sergeant George. Every effort has met rebuffs. Her constant reply is, "I'm completely negative towards this job and the people in it" (deft's exh. 3).

*Reduction in Grade*

As a result of George's continued employment performance problems, on March 20, 1984 the Postal Service issued a notice to George proposing to reduce her in grade from a Security Supervisor to a Postal Police Officer. The notice was based on two charges: 1) conduct unbecoming a U.S. Postal Service Supervisor and 2) failing to perform the duties of a Security Supervisor (deft's exh. 4). Charge 2 was based on George's marginal performance evaluations issued in 1983 and 1984. Charge 1 was based on the following incidents:

On February 3, 1984, at approximately 4:15 p.m., while at an interview to discuss your merit evaluation with Lt. A. Jenkins, Jr., Acting [Senior Officer In Charge], and Lt. R.C. Warren, Sr., you violated Section 157–Z of Handbook IS–702, in that after you read your evaluation you verbally abused Lt. Warren by assuming a belligerent attitude while shaking and jabbing your finger vigorously in his face.

On February 3, 1984, while at the same interview, you violated Section 157–M of Handbook IS–702 in that you used unnecessarily harsh and boisterous language while meeting with Lts. Jenkins and Warren. Also, at about 4:52 p.m., you profanely referred to Lts. Jenkins and Warren as "You ass kissing bastards." You also referred to Lt. Warren as "You yellow punk." Again later in the day, you told Lt. Warren that "I'm tired of you shitting on me."

On February 3, 1984, at approximately 11:15 p.m., you violated Section 157–H of Handbook IS–702, in that you were disrespectful and insubordinate to a superior officer and did verbally threaten Lt. R.C. Warren, Sr. Lt. Warren asked you a legitimate official business question and you replied by stating "I'll be waiting for you downstairs after work. I'm tired of you shitting on me." Security Supervisor T. Valentine and M. Pedro were present at the time you threatened Lt. Warren (deft's exh. 4)[4].

4. The provisions of Handbook IS–702 referred to in the notice of proposed reduction in grade state as follows:

Postal Inspector J.T. Herrmann ("Herrmann") sustained the notice of proposed reduction in grade, and reduced George to a Postal Police Officer, effective July 6, 1984.

*Discharge from Postal Service*

Following the incidents of February 3, the Postal Service notified George on February 9, that she was to be detailed to FDR Station in Manhattan, another Postal Service facility, for a temporary period (deft's exh. 51). George was scheduled to begin on February 11, but never reported to the new station. Indeed, subsequent to February 3, George never again reported to work at the Postal Service. Thereafter, it is stipulated that George utilized accumulated sick leave for the period February 4 through April 20, 1984, and was granted leave without pay status for the period from April 21 through September 14, 1984 (Stip. 21; Tr. 125–126).

However, despite providing medical documentation to justify her absence through September 14, since George had been found fit for duty following a fitness for duty examination conducted on July 12, Herrmann corresponded with George on September 12, and instructed her to continue submitting documentation from her physician to support her ongoing absence subsequent to September 14. Herrmann also instructed George to contact him if she had any questions (deft's exh. 42; Tr. 123).

It is undisputed that George failed to submit any further medical documentation, failed to contact Herrmann, and failed to report to work. Consequently Herrmann informed George on January 7, 1985 that she would be removed from the Postal Service, effective February 16, 1985 (Stip 22; jt. exh. 9). Herrmann's notice stated that the proposed removal was based on two charges: (1) Failure to maintain George's assigned schedule, in that she failed to be in regular attendance since February 4, 1984, and her failure to notify supervisors of the reason for her absence following September 14, 1984, and; (2) failure to obey official instructions, based on George's failure to follow Herrmann's instructions to provide him with medical documentation explaining George's absence without leave since September 15, 1984. Additionally, the notice of removal stated that George's prior reduction in grade had been considered in arriving at the decision to discharge George (jt. exh. 9).

George responded to the notice of removal by letter dated January 14, 1985 indicating that "[she was] aware of the rules regarding absence from duty. [She was] also capable of following instructions." George also conceded, "I acknowledge the failure on my part to send in doctor's statements after september [sic] 1984." Yet George maintained that she was "still ill" and inquired "why continue to send in medical documentation when I have been deprived of pay of any kind since April 1984?" (deft's exh. 9).

There can be no doubt, however, that the Postal Service regulations concerning employee attendance, procedures for requesting leave, and the documentation necessary to justify absence from duty were set forth in the EMPLOYEE AND LABOR RELATIONS MANUAL ("ELM"), and were made available to Postal Service employees in a Postal Bulletin, dated May 17, 1984 (deft's exh. 38). It is also evident that the regulations clearly warned postal employees that "when correction of an employee's attendance problem is not achieved dismissal is usually the result" (*Id.*).

---

157 PROHIBITED CONDUCT. Actions or conduct for which an officer may be disciplined (including discharge) encompass, but are not limited to:

. . . . .

h. Any display of disrespect between Officers or malicious statements regarding an Officer;

. . . . .

m. Use of indecent, profane or unnecessarily harsh or loud language while on duty or in uniform;

. . . . .

z. Any other act or omission which is contrary to good order and efficient operation.

In accordance with these strict guidelines, Herrmann's response, dated February 4, 1985, informed George that the Postal Service's decision to remove her remained effective February 16, 1985 (deft's exh 59).

## CONCLUSIONS OF LAW

The court has jurisdiction over this matter by virtue of Title VII, § 706, 78 Stat. 259, as amended, 42 U.S.C. § 2000e–5.

Title VII limits employers from considering gender when rendering employment decisions. On its face, it forbids an employer to:

> fail or refuse to hire or to discharge any individual, or otherwise to discriminate with respect to his compensation, terms, conditions, or privileges of employment, [or to] limit, segregate, or classify his employees or applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex.

42 U.S.C. §§ 2000e–2(a)(1), (2).

■ This Title VII action properly qualifies as a disparate treatment matter. The Supreme Court has held that when a Title VII action involves a claim for disparate treatment, two independent analytical frameworks exist respecting the evidentiary burdens imposed upon the employer and employee, depending upon whether the motivation behind an employment decision is claimed to be pretextual or alleged to be characterized by mixed-motives.

A traditional pretext case raises the issue whether a legitimate *or* illegitimate motive was the true reason for the employer's actions. The Court set forth the relative allocation of evidentiary burdens and order of presentation of proof in a Title VII pretext case in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and in *Texas Dep't. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The analysis involves a three-step process:

First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant 'to articulate some legitimate non-discriminatory reason for the employer's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a *pretext* for discrimination.

450 U.S. at 252–53, 101 S.Ct. at 1093 (*quoting* 411 U.S. at 802, 93 S.Ct. at 1824), (emphasis supplied).

Importantly, to establish a *prima facie* case, the plaintiff must demonstrate that "(1) she belonged to a protected group (2) she was qualified for her position (3) she was discharged, and (4) her discharge occurred under circumstances giving rise to an inference of sex discrimination." *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188–89 (2d Cir.1987); *See McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. As stated by the Court in *Burdine*, 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7, in a Title VII context the phrase *"prima facie* case" is intended to "denote the establishment of a legally mandatory, rebuttable presumption." It is equally well-established that "once a Title VII case has been 'fully tried on the merits,' the question whether the plaintiff has established a *prima facie* case 'is no longer relevant' " *Ottaviani v. State Univ. of New York At New Paltz*, 875 F.2d 365, 373 (2d Cir.1989) (*citing Mitchell v. Baldridge*, 759 F.2d 80, 83 (D.C.Cir.1985)) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, at 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403).

The defendant, in turn, must then rebut the presumption through the presentation of a legitimate, nondiscriminatory reason. This can be accomplished by the introduction of admissible evidence which serves to

"[raise] a genuine issue of fact as to whether [defendant] discriminated against the plaintiff" *Id.* 450 U.S. at 254–55, 101 S.Ct. at 1094.

Assuming the defendant succeeds in providing a legally sufficient explanation to justify a judgment in its favor, the plaintiff may still prevail if she is able to demonstrate that the defendant's "proffered reason was not the true reason for the employment decision ... She may succeed in this either directly by persuading the court that the discriminatory reason more likely motivated the employer or indirectly by showing that the employer's reason is unworthy of credence" *Id.* at 256, 101 S.Ct. at 1095.

In situations, however, where the plaintiff is able to provide direct evidence that the employment decision is the product of a mixture of legitimate *and* illegitimate motives the burdens of proof illustrated in *McDonnell Douglas* and *Burdine* are not applicable. As the Court's plurality opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), recently articulated, a different framework applies:

> "when the plaintiff proves that her gender played a motivating part in an employment decision, the employer may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account." *Id.* 109 S.Ct. at 1795.

Thus, the modified "mixed-motive" analysis is to be applied when the plaintiff demonstrates by means of direct evidence "that it is more likely than not that a forbidden characteristic played a part in the employment decision ..." *Id.* at 1789

n. 12. Following such a showing the defendant must prove, by a preponderance of the evidence, that at the time the decision was made it focused only on legitimate nondiscriminatory criteria.[5] *Id.* at 1785, 1788. But, if the plaintiff fails to make its initial showing, "then she may prevail only if she proves following *Burdine*, that the employer's stated reason for its decision is pretextual." *Id.* at 1789 n. 12.

The District Court must decide, at some point, which analysis to apply based on the factual evidence presented by both sides. *See Price Waterhouse*, 109 S.Ct. at 1789 n. 12. Here, the court is inclined to follow the *McDonnell Douglas* and *Burdine* framework, and under such an analysis George ultimately failed to establish that defendant intentionally discriminated against her on the basis of her sex. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 ([plaintiff's] burden [to demonstrate that defendant's proffered reason was not the true reason for the employment decision] now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination). George was not able to meet her burden first because she could not identify similarly situated male security supervisors, *i.e.*, individuals whose job performance was similar to hers, who made threatening actions toward their superiors, and who abandoned their job, and second because she was unable to demonstrate that her superiors treated her less favorably than her male counterparts on account of her gender.

As discussed heretofore, George asserts that she was treated less favorably than male supervisors when she was provided unequal facilities and equipment; that Warren and Scalici, motivated by gender-based factors, were hostile, harassed and

---

**5.** It is important to note that under either situation the ultimate burden of persuasion stays with the plaintiff. Thus, in a *McDonnell Douglas* and *Burdine* scenario, "even after a plaintiff has made out a *prima facie* case of discrimination under Title VII, the burden of persuasion does not shift to the employer to show that its stated legitimate reason for the employment decision was the true reason" *Price Waterhouse*, 109 S.Ct. at 1788 (*citing Burdine*, 450 U.S. at

256–258, 101 S.Ct. at 1095–96). Similarly, in a *Price Waterhouse* mixed-motive case "the plaintiff retains the burden of persuasion on the issue whether gender played a part in the employment decision ... the employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the factfinder on one point, and then the employer, if it wishes to prevail, must persuade it on another" *Id.*

embarrassed George; and, that gender played a motivating role in Scalici's 1983 mid-year evaluation of George's employment performance resulting in the Postal Service's decision to reduce George's pay grade and its decision to discharge George (pltf's post-trial Conclusions of Law at 8).

■ First, regarding the allegation of unequal facilities and equipment, we have seen that George claims she was discriminated against because she did not have her own private swing room, instead she had to share one with her subordinates and was allegedly forced to complete reports and do paperwork on her subordinates in their presence. There is no doubt George was employed in a unique situation, but as the only female supervisor she should have expected that certain differences in accommodations might exist given the limited available facilities. It is also clear, however, that George had access to the same or more privacy than did her male counterparts.

George was assigned to the only available locker room for female personnel, and shared it with eight female PPO's; fifteen male supervisors shared their locker area and unlike PPO's who were assigned to a specific post the supervisors could come in and out of the locker area at any time. The locker room for the male supervisors was combined with a swing room. Warren and George's male colleagues had informed George, however, that males only used the area for changing at the beginning and end of their tour and otherwise George was not barred from utilizing the Supervisor's swing room to complete reports. George merely had to exercise a certain degree of discretion before entering, but she declined to share the area with her male colleagues. Moreover, as stated before, even if George had reason to avoid using the supervisor's swing room, since she worked a night tour, George had access to several vacant rooms, including the nearby inspection offices or the training facilities.

The court has similarly found no credible proof that the Postal Service failed to provide George with suitable facilities and equipment to file reports and other doc-

uments or failed to provide adequate lavatory accommodations. On the contrary, Jenkins testified that George was treated no differently than any other sergeant in that she was provided access to the same file cabinet located in the Control Center (Tr. 317). Jenkins also stated that the sergeants were not issued individual file cabinets (Tr. 316), but George admitted requesting and ultimately receiving one (Tr. 39–40).

Lastly, there is little merit to George's allegation that the training she received upon her promotion was indicative of discriminatory practices on the part of defendant. George admitted that she received the same training as did Jenkins (Tr. 77). That admission was corroborated by Jenkins (Tr. 310–11), the only other individual who was similarly situated to George with respect to training.

■ Second, George's attempt to prove that Scalici and Warren personally discriminated against her on the basis of sex falls short of the mark. Although it is no secret that George experienced more difficulties following Warren's transfer as George's supervisor, there is credible testimony from Jenkins and Scalici that this fact stemmed more so from Warren's "aggressive" supervisory style, juxtaposed with Moir's "laid back" style (Tr. 312, 320, 417, 420), than from any alleged propensity towards sexual harassment. In fact, Warren attempted to counsel George and work out their differences. He referred George to the National Association of Postal Supervisors (NAPS), an organization which represents all supervisors in the Postal Service except inspectors (Tr. 252). The NAPS representative, George and Warren met for dinner on several occasions in an attempt to pacify the volatile relationship that existed between Warren and George, but Warren explained that George refused to cooperate, showing up late or refusing to eat (Tr. 253). Even when some progress was made Warren testified that George soon reverted to a hostile attitude (Tr. 294). Simply put, Warren demanded more professionalism and a greater level of interaction from George than Moir, and George inter-

preted this as harassment, preferring to perceive herself as the female scapegoat rather than conforming to her new supervisor's management style.

■ But Warren is not the only one from whom George rebuked offers of assistance and characterized as guilty of gender-based discrimination. She accuses Scalici of a "lack of sensitivity towards [her] position" and "gender bias," and that subsequent to her filing of sex discrimination charges with the EEOC "Scalici began to criticize [George's] every mistake, however minor, in order to harass" (pltf's post-trial Findings at 5). According to Scalici, however, George "refused to accept any assistance from either myself or any of her fellow supervisors ... [S]he couldn't get along with fellow supervisors at all" (Tr. 356). In fact, other supervisors—including supervisors from other tours with whom George interacted in order to pass on information—had approached Scalici with complaints (Tr. 357).

As George's second level supervisor, Scalici was overseeing George, her peers and underlings, and her immediate superiors. His responsibility was to insure the harmonious operation of the larger tour under his direction (Tr. 351). Thus, the court is not persuaded that Scalici's intentions in criticizing George performance and attitude were meant to attack her as a female. In fact, Scalici personally attempted to assist George by investigating George's complaints of sexual harassment by her co-workers. He discovered that the other supervisors had met similar rebuffs in their attempts to advise and assist George in the proper performance of her duties (Tr. 472). It is more likely that Scalici's critical references were a blunt attempt to apprise George of her deteriorating level of efficiency as part of his overall unit. While there is little dispute that Scalici became highly skeptical of George's continuing ability to effectively contribute as a Security Supervisor, the court will not accept George's assertion that Scalici's comments or evaluations were motivated by sex discrimination.

The crux of George's case, of course, centers upon the marginal mid-year performance evaluation Scalici issued to her in 1983, her subsequent reduction in pay grade in 1984 and her termination in 1985. And George relies on Scalici's January 1983 performance evaluation to establish that gender played a motivating part in the subsequent events that culminated in her discharge. But, in reality, it is George's own actions and inactions which directly caused the Postal Service's adverse employment decisions. To reiterate, the evaluation stated in relevant part:

> [George] has the potential of becoming a Very Good Supervisor. However, she has a 'chip' on her shoulder about being a woman, and this interferes with her work. For example, she has complained often that the other supervisors on her tour are trying to frame her, are making a fool of her, and 'give' her the 'shaft' because she is a female (pltf's exh. 5).

George points to Scalici's statement that she had a "chip" on her shoulder about being a woman as proof that Scalici discriminated against her based on sex (Tr. 55). Scalici responded that his comment was intended to convey that George "had an attitude that she was constantly being harassed and picked on because she was a woman ... and [that this complaint] was just a constant argument on her part" (Tr. 371).

It is uncontroverted, however, that George failed to identify any supervisor whose performance was similar to hers, but who had not received such a low evaluation. On the contrary, Scalici recalled that he had issued a marginal rating to a male supervisor who was—similar to George—also a poor performer on the job (Tr. 374–75). Nor is Scalici's comment in George's January 1983 evaluation that she had a chip on her shoulder about being a woman evidence of a discriminatory attitude. Both Scalici and Warren testified that George put her sex at issue from her first day on the job, before any of her superiors even had time to supervise her. Indeed, throughout George's time at Morgan GMF, her immediate reaction to any

attempt to correct her was that she was being corrected because she was a woman.

Although it was common practice for more experienced supervisors to help out a new supervisor such as George, she rejected such advice and viewed it as harassment (Tr. 371–72). Scalici summarized that as a result of George's rejection of all help and assistance:

> [I]t had come to the point where the supervisors instead of trying to help her, they would just let her go ahead and do things on her own because she insisted that she had to do it her way. And they had—they were really getting fed up with it and they said, 'Well, let her go' (Tr. 373).

As the evidence indicates George expected to be left alone, not to have to cooperate or to be corrected in any way. In sum, the court determines that it was George that automatically reacted antithetically when Scalici and Warren critically evaluated her performance. And George only compounded the problem by flatly denying any responsibility for potential professional misgivings and rejecting efforts of assistance and guidance, rather than accepting correction and attempting to improve her work performance.

As the court has found Scalici and Warren continued monitoring and evaluating George in accordance with their respective supervisory duties, and issued George marginal reports in January of 1984 with detailed comments respecting their evaluations. The court also found that the adverse 1983 and 1984 evaluations and reports directly resulted in the Postal Service's 1984 notice to George reducing her pay grade.

The court concluded, nevertheless, that George failed to demonstrate that her 1983 evaluations were undeserved, nor did she show that her 1984 marginal evaluations were unwarranted. Similarly lacking is any proof that George's reduction in pay grade improperly resulted from illegal sex discrimination by George's supervisors. Conversely, as previously discussed, defendant has articulated several legitimate, nondiscriminatory reasons for its actions—

succinctly stated—George was reduced in grade because of her marginal performance evaluations and her behavior towards her supervisors, Warren and Jenkins, on February 3, 1984 (deft's exh. 4). And the court is simply not persuaded that defendant's articulated reasons were pretextual.

Finally, the court holds that the February 1985 decision to remove George from duty was properly made in accordance with Herrmann's enunciated reasons: As a result of George's absence without leave after September 15, 1984, without notifying the Postal Service of the reason for her continued absence, and based on George's prior reduction in pay grade and her marginal performance evaluations.

Defendant convincingly established that George's actions justified the steps taken to remove her, but George failed to prove that defendant's motivations were really pretext for gender discrimination. Without a doubt, the factual basis for her discharge was rooted in George's failure to abide by office policy and the decision to remove George fell well within the parameters of well-documented procedure. Thus, although the circumstances surrounding George's removal were obviously unfortunate for her, George did not introduce evidence that Herrmann, who was directly responsible for her removal, treated her unfairly and, ultimately could not meet her burden of proof regarding her claim of discriminatory discharge.

## CONCLUSION

In light of George's unsuccessful claims of gender discrimination against the Postmaster General the court dismisses the complaint and awards judgment in favor of defendant Postmaster General. The clerk shall enter judgment accordingly. Each side shall bear its own attorney's fees and costs.