**Rhonda CALLANAN, Plaintiff,**

v.

**Marvin T. RUNYUN, Postmaster General, United States Postal Service, Defendant.**

Civ. No. 3–92–807.

United States District Court, D. Minnesota, Third Division.

Aug. 24, 1994.

Kenneth Ross White, Farrish Johnson & Maschka, Mankato, MN, Kevin O'C Green, Green Law Office, Mankato, MN, for plaintiff.

Lonnie F. Bryan, U.S. Atty. Office, Minneapolis, MN, for defendant.

## ORDER

KYLE, District Judge.

Before the Court is Magistrate Judge Erickson's Order and Report and Recommendation. The Order, from which no appeal has been taken, grants Defendant's Motion to Strike Plaintiff's Request for a Jury Trial and for Compensatory Damages. The R and

R recommends that Defendant's Motion for Summary Judgment be granted with respect to Plaintiff's hostile environment and retaliation claims and denied with respect to Plaintiff's disparate treatment claims. Defendant has filed timely objections to the R and R "to the limited extent that it does not recommend dismissal of plaintiff's disparate treatment claim." Counsel for defendant "suggests" that a further hearing might be appropriate in order to receive additional factual information by way of evidence and affidavits. No explanation is advanced as to why this additional material was not submitted with the Motion for Summary Judgment. The Court does not intend to reopen the summary judgment hearing.

The Court has conducted a de novo review of those portions of the R and R to which objections have been interposed. The Court adopts the thorough and well reasoned Report and Recommendation of Judge Erickson.

Upon all the files, records, and proceedings herein, IT IS ORDERED that Defendant's Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's hostile environment and retaliation claim and **DENIED** with respect to Plaintiff's disparate treatment claim.

## ORDER AND REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 27th day of July, 1994.

### I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(B), upon the Defendant's Motion to Strike the Plaintiff's request for a Jury trial and upon the Defendant's Motion To Dismiss or, in the alternative, for Summary Judgment.

A Hearing on the Motions was conducted, at which time the Plaintiff appeared by Kevin O'C. Green, Esq., and the Defendant appeared by Lonnie F. Bryan, Assistant United States Attorney. Following the submission of post-Hearing briefs, the issues are now ripe for determination.

■ For reasons which follow, we grant the Defendant's Motion to Strike,[1] and we recommend that the Motion for Summary Judgment be granted in part and denied in part.[2]

### II. Factual and Procedural Background

The United States Postal Service hired Rhonda Callanan ("Callanan") as a part-time, flexible distribution clerk at the Mankato Post Office. In 1989, Callanan requested a transfer to a part-time, flexible position on the day shift, and the Post Office approved the transfer. As a part-time, flexible city carrier, Callanan sorted, delivered and collected mail on various routes around Manka-

---

1. Since the parties are in agreement that all of the Defendant's alleged conduct occurred prior to the effective date of the Civil Rights Act of 1991 (the "Act"), Public Law No. 102–166, 105 Stat. 1071, in order to defeat the Defendant's Motion to Strike, the Plaintiff must show that the provisions of the Act, which relate to the conduct of Jury trials and to the award of compensatory and punitive damages, were intended to apply retroactively. By its decision in *Landgraf v. USI Film Products*, —— U.S. ——, ——–——, 114 S.Ct. 1483, 1505–1506, 128 L.Ed.2d 229 (1994), the United States Supreme Court expressly held that the general presumption against statutory retroactivity precludes the right to a Jury trial and the recovery of compensatory and punitive damages for claims arising before the effective date of the Act. Accordingly, the Defendant's Motion to Strike should be granted.

2. In opposition to the Summary Judgment Motion, Rhonda Callanan ("Callanan") submitted an Affidavit that is as broadly conclusory as her Complaint. No Affidavits were filed by the Defendant, although the parties have filed 13 depositions for the Court's consideration. As a consequence, in order to ascertain the specifics of Callanan's claims of sex discrimination, and of the Defendant's rejoinder to those claims, we were obligated to parse through more than 600 pages of deposition testimony. Needless to say, the parties' approach toward the presentment of Summary Judgment issues is unnecessarily time-consuming and is inordinately burdensome on the Court.

to, and she filled in for other carriers when they were on sick leave, vacation or were otherwise absent.

Although Callanan had experienced no difficulties in her original clerk position, she confronted a series of problems in her position as a carrier. Callanan claims that her difficulties were caused by a hostile work environment, and by her employer's disparate treatment, which was caused by her gender. In this latter respect, Callanan notes that, out of 40 or more carriers assigned to the Mankato Post Office, only a handful are female and, of them, at least two have complained that their treatment in the workplace is less favorable than their male co-employees. She also contends that her supervisors have assigned her less preferable delivery and collection routes than assigned to the male carriers, who were in comparable positions, and who had equal or less seniority.[3] Callanan also alleges that she was treated unfairly, when compared to male employees, in the area of discipline.[4]

Specifically, in March of 1990, the Postal Service issued a letter of warning to Callanan when she left mail in an unlocked postal vehicle. Callanan contends that she did not receive a copy of the letter, and that she did not know it existed until three months after

the incident, when a former supervisor told her of it. On that same date in March, another part-time carrier, Milton Zernechel ("Zernechel"), also received a letter of warning relating to the same type of offense. Zernechel has testified to his belief, however, that he was disciplined solely to cover the fact that the Postal Service had issued a similar letter to Callanan.

On the Plaintiff's behalf, the National Association of Letter Carriers filed a grievance with the Post Office over the letter of warning. The Plaintiff asserts that she was not allowed to participate in all of the proceedings, which were intended to resolve her grievance, and that the union representative who represented her, Larry Buckmeister ("Buckmeister"), did not advise her of any settlement negotiations or of any offer of settlement. Callanan contends that management knew that Buckmeister was antagonistic toward her and, yet, allowed him to represent her and accepted his word that she had refused to sign the grievance letter, and had agreed to settle the matter.[5] The settlement in question allowed for the removal of the warning letter from the Callanan's personnel file but, according to the Callanan, she had not accepted the settlement proposal.[6]

**3.** The Defendant has countered that Callanan was not interested in increased work opportunities and that she refused additional work assignments as they became available. In turn, Callanan contends that her time-cards were marked as if she had refused additional work assignments even when she had not.

**4.** Callanan also relates that, unlike similarly situated male employees, two of her requests for personal leave, which were prompted by family emergencies, were not honored by her employer. On one occasion, Callanan's supervisor met her on her route to advise that Callanan's son had taken ill at day-care with a case of the flu. Callanan telephoned her mother who assumed the care of Callanan's son until her work shift was completed. The record does not suggest how this incident differs from the manner in which the Defendant would have responded had a male employee been involved. On a second occasion, Callanan's 11–month old son was scheduled to undergo day-surgery to remove a growth from his ear. Callanan had not requested time off, although she had advance notice of the date of the surgery. At the request of her supervisors, Callanan returned to work while her son was in the recovery room. While, understandably, Callanan felt put upon to return to

work, the record before us does not demonstrate that she had requested any form of personal leave that was denied to her because she was a female.

**5.** According to Callanan, on a prior occasion Larry Buckmeister ("Buckmeister") had called her a "bitch." Callanan reported the incident to one of her supervisors, Brian Ziemer ("Ziemer"), who spoke to Buckmeister regarding Callanan's objection to the use of that epithet. There is no indication before us that Buckmeister's use of that terminology reoccurred following Ziemer's intervention. Callanan also complains that, at some time in the past, certain unidentified co-workers had called her "Missy," and that she dislikes the reference. There is no indication in the record before us, however, that Callanan reported this name-calling to her employer.

**6.** Callanan also complains that the relief awarded by the settlement of her grievance—namely, the removal of the warning letter from her personnel file—would have occurred, as a result of the language in the pertinent collective bargaining agreement, irrespective of the resolution of her complaint. The record before us fails to

The Plaintiff also alleges that Brian Ziemer ("Ziemer"), who supervised her immediate supervisors, informed her that she would have an "uphill battle" if she were to succeed as a carrier because of the disciplinary incident.[7] Ziemer does not remember making any similar comment to Zernechel, who had been cited for having committed the same offense. In addition, Callanan claims that one of her immediate supervisors, Terry Walls ("Walls"), told her that she thought Callanan was going to go back to being a clerk because she could not handle the carrier job.

In August of 1990, Callanan received a threatening phone call[8] at her residence that she believed was made by Al Beahm ("Beahm"), a part-time carrier who had unsuccessfully competed with her for a job bid.[9] Callanan reported the call to Postmaster James Kirschbaum ("Kirschbaum") who interviewed Beahm as a part of his investigation of the matter. Beahm verbally denied calling Callanan at home and, subsequently, he wrote a letter to the Postmaster to that same effect. Kirschbaum related Beahm's denials to Callanan, and requested that Callanan provide him with any additional evi-

dence that would support her suspicion that Beahm had made the telephone call. Finding no evidence that Beahm was the guilty party, Kirschbaum did not discipline Beahm for the incident. Kirschbaum does recall telling Callanan to contact the local postal inspection service or the police if she wished to pursue her complaint, but Callanan denies that any such comment was made by Kirschbaum, and she also denies any request on his part for other evidence which would incriminate Beahm.[10]

As a result of the foregoing, Callanan filed a Complaint with the Equal Employment Opportunity Commission ("EEOC") which, apparently,[11] alleged that she had been treated differently than male employees with respect to the terms and conditions of her employment. She also filed a stress claim with the United States Department of Labor, which sought Worker's Compensation benefits. While that claim was being processed, Callanan's psychologist concluded that she was unable to work with other postal carriers. On May 6, 1991, Callanan requested a temporary, light-duty assignment in which she would have no contact with other postal carriers. Kirschbaum approved such a light-

suggest what Callanan was requesting by her grievance or, for that matter, what relief was available under the collective bargaining agreement. We do note that, as a result of this incident, Callanan did not suffer any loss of time, nor did she suffer any monetary penalty.

7. Ziemer is also reported to have taken some glee in the prospect of disciplining Callanan for overlooking some express mail. Apparently, however, the cheeriness was short-lived when Ziemer learned that a male employee was guilty of the oversight.

8. As related in Callanan's deposition testimony, Al Beahm ("Beahm") is reported to have called her in order to tell her that, if she were to interfere with the posted work schedules again, then she would have her "ass chewed." At the time, Callanan had reported to management that she was entitled to a posted position, which had been assigned to Beahm, because of her seniority. Following her report, management assigned the work to Callanan.

9. During the course of her deposition, Callanan related an incident when "Al Beam [sic] grabbed my butt when walking up the stairs." Callanan Deposition, at 155–56. She testified that he had done so on previous occasions and that, "after a

while I didn't say anything because I didn't have anyone to say it to." Id. In the course of the same deposition testimony, Callanan stated that, continuously, male co-workers would comment "nice butt" as she would walk through the work area. She reported these incidents, including that involving Beahm, to a supervisor, but the record is unclear what responsive action, if any, her supervisor took. When asked why she had not included any of these incidents in the complaint that she had filed with the EEOC, Callanan responded: I included the things that at the time were important to me and affected my job and performance. That stuff bothered me, but in the big picture, it's the other stuff that was affecting my job; the hours, the routes.

10. Callanan reports that she had informed Kirschbaum that she was prepared to take a lie detector test, which was not pursued. Notwithstanding that fact, the record is devoid of anything other than Callanan's suspicions to implicate Beahm. We can accept that Callanan's suspicions were firmly held in good faith, but we are at a loss to determine how such suspicions, without more, can credibly implicate Beahm so as to warrant a disciplinary sanction.

11. Callanan's EEOC Complaints are not in the record before us.

duty position for Callanan, and she was assigned work as a mail sorter in the evening hours.

Following her assignment as a mail sorter, an incident occurred in which two sexually explicit pictures were left in an area where Callanan would have been expected to frequent during the course of her work assignment.[12] Callanan found the materials and turned them over to a supervisor in another department who, Callanan contends, promptly misplaced them.[13] According to Callanan, no investigation was conducted and one of Callanan's supervisors characterized the pictures, at least in her view, as "pretty much it's no big deal." Callanan Deposition, at p. 111. As a result of the picture incident and management's resultant failure to take remedial action, Callanan filed a second EEOC Complaint, alleging reprisal/retaliation that was attributable to her having filed her first Complaint.[14]

On June 21, 1991, the U.S. Department of Labor granted Callanan's Worker's Compensation claim. Subsequently, the Postal Service offered Callanan a limited duty assignment, which would have consisted of a 36–hour workweek. Callanan refused the assignment because of the hours involved. In August of 1991, Callanan's psychologist recommended a 20–hour workweek with minimal contacts with her co-employees and, in October of 1991, the psychologist recommended that Callanan be placed on disability status, or be allowed to seek alternative em-

ployment. On November 2, 1991, the Postmaster advised Callanan that she would be placed on disability status because the Postal Service could not provide her with work which was within her medical restrictions.

On December 4, 1992, Callanan filed this action alleging sexual harassment and discrimination, and retaliation under Title VII and under the Minnesota Human Rights Act ("MHRA"). See, Title 42 U.S.C. § 2000e–2(a), as incorporated in § 2000e–16; Title 42 U.S.C. § 2000e–3(a), as incorporated in § 2000e–16(d); Minnesota Statutes Section 363.03, Subdivisions 1(2) and 7. Following the completion of discovery, the Defendant filed the Motions which are presently before the Court.

### III. Discussion

 A. Standard of Review. Summary Judgment [15] is neither an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury to weigh the evidence and to render credibility determinations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A Summary Judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56, Federal Rules of Civil Procedure. For these purposes, a disputed fact is

---

12. On one prior occasion, Callanan received a *Penthouse* magazine at her home. While Callanan suspects that someone at the Post Office in Mankato was responsible for its transmission to her, the record before us provides no substantiation for her suspicions. There is also evidence in the record that, at one point, a poster was hung in the work environs at the Post Office that, apparently, was critical of Callanan and that it remained in view for some period of time before being removed. Unfortunately, the one individual, who attested to the presence of the poster, could not recall what about the poster was objectionable. We do note that a document has been identified as an Exhibit to certain of the depositions which has the words "Rhonda" and "Missy" printed on it. The Exhibit contains no obvious sexually disparaging statement but, inferentially, the language on the Exhibit may be read to suggest that Callanan was not a productive worker.

13. Our search of the record failed to uncover any evidence that the photographs were "misplaced." Nor do we find any corroboration for the graphic portrayal of Callanan's counsel that the photographs depicted acts of bestiality.

14. Based upon the allegations of her Complaint, it would appear that Callanan's reprisal charge was filed on or about May 10, 1992.

15. Taking advantage of the last sentence of Rule 12(b), Federal Rules of Civil Procedure, both parties have submitted materials, outside of the pleadings, for our consideration. Neither party contests the propriety of a Summary Judgment Motion on procedural grounds and, accordingly, we analyze the Defendant's dispositive Motions in accordance with the parameters of Rule 56, Federal Rules of Civil Procedure.

"material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) ("An issue of material fact is genuine if it has a real basis in the record.").

▆ As Rule 56(e) makes clear, once the moving party presents a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. While the Court views the evidence in favor of the non-moving party and gives that party the benefit of every justifiable inference that may be drawn from that evidence, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but * * * must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure, [emphasis supplied]; *Weber v. American Express Co.,* 994 F.2d 513, 515 (8th Cir.1993); *Honeywell, Inc. v. United States,* 973 F.2d 638, 641 (8th Cir.1992), citing *Ivan Spencer v. Kroger Company,* 941 F.2d 699 (8th Cir.1991); *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), cert. denied, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988); *Johnson v. Robbinsdale Independent School Dist. No. 281,* 827 F.Supp. 1439, 1441 (D.Minn.1993). The non-moving party may not rest upon the mere denials or allegations of its pleadings, nor may it simply argue that operative facts will be subsequently developed which will support its claim. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* supra at 586, 106 S.Ct. at 1355 ("[O]pponent must do more than simply show there is some metaphysical doubt as to the material facts."); see, generally, S. Childress, A New Era for Summary Judgments: Recent Shifts at the Supreme Court, 116 F.R.D. 183, 188 (1987).

▆ Moreover, a party is entitled to Summary Judgment when its opponent has failed "to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. at 2552. In such a case, no genuine issue of material fact will be found to exist because "a complete failure of proof concerning an essential element of [that party's] case necessarily renders all other facts immaterial." Id. at 323, 106 S.Ct. at 2552. "In determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard." *Nebraska v. Wyoming,* 507 U.S. 584, ——, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). If reasonable minds could differ as to the import of the evidence, however, Summary Judgment should not be granted and, in exercising its function, the Court is not to weigh the evidence. *Anderson v. Liberty Lobby, Inc.,* supra at 250–51, 106 S.Ct. at 2511–12; *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987).

B. Legal Analysis. As stated, the Defendant has moved for the summary resolution of the Plaintiff's MHRA claims, and of her claims under Title VII. In support of such a disposition, the Defendant has argued that Title VII preempts any discrimination claims that a Federal employee may have, which are premised upon State law, and that, in turn, the Federal Employees' Compensation Act ("FECA"), Title 5 U.S.C. 58101 et seq., is the sole vehicle by which the Plaintiff may recover on a work-related claim. Beyond these contentions, the Defendant maintains that he is entitled to Judgment, as a matter of law, on the merits of the Plaintiff's sex discrimination and reprisal claims.

While we agree that, as a matter of law, the Plaintiff has no cause of action under the MHRA, we find no merit to the Defendant's contention that the Plaintiff's sole avenue of recovery is pursuant to the FECA. Further, we find the merits of the Plaintiff's disparate treatment claims to be surfeited with genuine issues of material fact, which preclude a Summary Judgment, but we conclude that the Plaintiff's abusive work environment and reprisal claims fail, as a matter of law.

1. Callanan's MHRA Claim.

▆ In arguing "preemption" and "waiver of immunity," both of the parties have ig-

nored the obvious issue: Does the MHRA purport to regulate the employment practices of the Federal Government? Given the language of the MHRA and the absence of any reported application of the Act to Federal employees over the 40–year life of the Act, we answer that question in the negative. In doing so, we have closely examined the Plaintiff's claims under Minnesota Statutes Sections 363.03, Subdivisions 1(2) and 7, and we address each of these claims, in turn.

Under the provisions of Section 363.03, Subdivision 1(2), an "employer" is prohibited from engaging in discrimination that is based upon sex. An "employer" is defined, for purposes of the MHRA, as "a person who has one or more employees." Minnesota Statutes Section 363.01, Subdivision 17. A "person," for purposes of the MHRA, is defined as including a "partnership, association, corporation, legal representative, trustee, trustee in bankruptcy, receiver, and the state and its departments, agencies, and political subdivisions." Minnesota Statutes Section 363.01, Subdivision 28. Obviously, the Defendant, as the Postmaster General of the United States, is not within the listing of entities which are included in the statutory definition of a "person." while, generically, the Postmaster is an individual and, in common parlance, is a "person," we think such a broadly inclusive definition, as is essential to encompass the Defendant, would contravene the Minnesota Legislature's insistence upon explicitly referring to "the state and its departments, agencies, and political subdivisions" in its definition of terms. Given the sensitive considerations of federalism which necessarily pervade a State's interest in regulating the employment relations of the wholly sovereign Federal weal, we are confident that, if the Minnesota Legislature intended to oversee the conduct of the Federal Government, in its capacity as an employer, then any such intention would have been made clear, if not express.

The same may be said for the Plaintiff's claim under Section 363.03, Subdivision 7, which prohibits intentional reprisals against an employee who exercises rights that have been secured under the MHRA. This prohibition, however, is restricted to the discriminatory practices of an "employer, labor organization, employment agency, public accommodation, public service, educational institution, or owner, lessor, lessee, sublessee, assignee or managing agent of any real property, or any real estate broker, real estate salesperson or employee or agent thereof." Minnesota Statutes Section 363.03, Subdivision 7. In addition to not qualifying as an "employer," the Defendant does not minimally qualify as an "employee or agent" of a "public service"—which would appear to be the closest approximation of the Defendant's posture, at least in the lexicon of the Act.[16] For the purposes of the MHRA, a "public service" means "any public facility, department, agency, board or commission, owned, operated or managed by or on behalf of the state of Minnesota, or any subdivision thereof, including any county, city, town, township, or independent district in the state." Minnesota Statutes Section 363.01, Subdivision 34. Once again, the clear intent of the Minnesota Legislature was to regulate State and local governmental units, and there is not the slightest intimation that the Legislature was desirous of managing the employment practices of the Federal Government, or any of its instrumentalities.

Absent a showing, which the Plaintiff has failed to proffer, that any provision of the MHRA, or any evident legislative history, evinces the State's intent to govern the employment practices of the Federal Government, we are disinclined to judicially legislate such a purpose into the Act.[17]

---

**16.** Whatever may be said of the Defendant as an "employee or agent" of an "owner, lessor, lessee, sublessee, assignee or managing agent of any real property," the allegations of the Plaintiff's Complaint are solely related to the course of her "employment," and do not purport to assert a claim against the Defendant in anything other than an employment context.

**17.** We recognize that Minnesota Statutes Section 363.11 counsels a liberal construction of the Minnesota Human Rights Act ("MHRA") so as to accomplish its purposes, and that one of the stated purposes of the MHRA is "to secure for persons in this state, freedom from discrimination" in employment because of sex. Minnesota Statutes Section 363.12, Subdivision 1(1). Nevertheless, in our judicial role, we may no more author provisions, which would extend the prohi-

■■■■ Moreover, even if we were to have concluded that the prohibitions of the MHRA do, in fact, apply to the Federal Government, we believe that Callanan's State law action is preempted by her Title VII claim.[18] While there is precious little in decisional authorities which address this issue, we believe that the Supreme Court's holding in *Brown v. General Services Administration*, 425 U.S. 820, 829, 96 S.Ct. 1961, 1966, 48 L.Ed.2d 402 (1976), provides the clearest guidance on the subject. Although not addressing a State's anti-discrimination Statute there, the Court held that Section 2000e–16 created "an exclusive, preemptive administrative scheme for the redress of federal employment discrimination." The Court's holding was founded, in substantial part, upon the expectation that, if not exclusive and preemptive, the procedural limitations of Section 2000e–16 could be circumvented if "immediate access to the courts under other, less demanding statutes [were] permissible." *Id.;* see also, *Clement v. Motta*, 820 F.Supp. 1035, 1037 (W.D.Mich.1991); cf., *Miller v. Wackenhut Services, Inc.*, 808 F.Supp. 697 (W.D.Mo.1992). We think the same may be said here.

If the Plaintiff could maintain her claim under the MHRA, the procedural and time limitations of Section 2000e–16 could be readily avoided, and the Defendant could be exposed to compensatory and punitive damage claims which, as of the time of the incidents alleged here, Congress had denied to Title VII litigants. To the extent that it may appear, at first blush, to be unfair to limit a Federal employee to relief from employment discrimination that is provided under Title VII, when non-Federal employees' rights are not so restricted, the Court addressed and rejected the argument in *Brown*.[19] In view of the Supreme Court's keen reliance on the need to preserve the time limitations and procedures of Section 2000e–16 by making those provisions both preemptive and exclusive for Federal employees, we see no meaningful basis to diminish the same rationale when a State statute would undermine those same provisions.

Of course, we recognize that the result we reach is in conflict with the Court's decision in *Travis v. Frank*, 804 F.Supp. 1160, 1163 (E.D.Mo.1992)—a case which neither party drew to our attention—but we find the Court's reasoning there to be unpersuasive. While concluding that a Federal employee could pursue a discrimination claim under the Missouri Human Rights Act, the Court did not address the Supreme Court's holding in Brown, but rested its decision on the Supreme Court's earlier analysis in *Chandler v. Roudebush*, 425 U.S. 840, 841, 96 S.Ct. 1949, 1950, 48 L.Ed.2d 416 (1976). In *Chandler*, the Court concluded that, as a result of the enactment of Section 2000e–16, Federal employees would be entitled to the same cause of action which, previous to the enactment of that Section, was only available to private employees. While *Chandler* may be read as requiring that Federal employees be accorded the same right to vindicate employment discrimination that is available to non-Federal employees, we reject such an extended reading in view of the Supreme

---

bitions of the Act to employers in Wisconsin—as but one example—merely because the affected employee is a citizen and resident of Minnesota, than we can independently frame provisions which would extend the coverage of the Act to the Federal Government. We leave such extensions of the Act to the legislature in the first instance.

**18.** Callanan's reliance on Congress' waiver of the Defendant's sovereign immunity, which is clearly memorialized in Title 39 U.S.C. § 401(1), is misplaced. The issue is not whether, under appropriate circumstances, the Postal Service may sue or be sued, but whether Callanan holds any right, as a Federal employee, to sue her employer for sex discrimination, in an employment context, under a State statutory law.

**19.** This rejection is highlighted by the following observation in Justice Stevens' dissent in *Brown*. As the legislative history discussed in *Chandler v. Roudebush* * * * demonstrates, Congress intended federal employees to have the same rights available to remedy racial discrimination as employees in the private sector. Since the law is now well settled that victims of racial discrimination in the private sector have a choice of remedies and are not limited to Title VII, federal employees should enjoy parallel rights. *Brown v. General Services Administration*, 425 U.S. 820, 836, 838, 96 S.Ct. 1961, 1969, 1970, 48 L.Ed.2d 402 (1976).

Court's renunciation of that same argument in *Brown.* Since the decision in *Brown* closely followed in the wake of *Chandler,* and since the dissent in *Brown* was predicated on the reasoning of *Chandler,* we are not persuaded, as was the Court in *Travis,* that a Federal employee must be accorded the same remedies available to a non-Federal employee, including the right to pursue a discrimination claim under a State anti-discrimination statute.[20]

Accordingly, Judgment against the Plaintiff should be entered on her MHRA claims.

### 2. Callanan's FECA Claim.

■ Apparently oblivious to the starkly contradictory arguments that he has advanced, the Defendant now asserts that the preemptive and exclusive provisions of Title VII are excluded and preempted by the FECA. While the issue has not been resolved within our Circuit—at least insofar as our research and that of the parties has disclosed—the Defendant's argument has been considered and rejected by every Court which has confronted the issue.

Congress enacted FECA to provide Worker's Compensation benefits for Federal employees who sustain injuries in the course of their employment. Federal employees, including the United States Postal Service, are entitled to compensation for lost wages and work-related injuries under FECA. Federal Employees' Compensation Act, Title 5 U.S.C. § 8102(a). FECA provides that, "[t]he liability of the United States or an instrumentality thereof under [FECA] or any extension thereof with respect to the injury or death of a employee is exclusive." Title 5 U.S.C. § 8116. Nevertheless, the Courts which have considered the issue have, unanimously, rejected the position advanced by the Defendant. See, *Miller v. Bolger,* 802 F.2d 660

(3rd Cir.1986); *Eckley v. Bentsen,* 1994 WL 114646, at *5 (D.D.C.1994); *Nichols v. Frank,* 771 F.Supp. 1075 (D.Or.1991); *Gergick v. Austin,* 764 F.Supp. 580, 581 (W.D.Mo.1991); *Johnson v. Sullivan,* 764 F.Supp. 1053, 1063 (D.Md.1991); *George v. Frank,* 761 F.Supp. 256, 259 (S.D.N.Y.1991); *Sullivan v. United States,* 428 F.Supp. 79, 81 (E.D.Wis.1977).

Since we agree with the analysis of those Courts which have addressed the issue and, in view of the Defendant's failure to cite, let alone distinguish, the authorities which have discredited the argument he asserts here, we recommend that his Motion be denied.[21]

### 3. Callanan's Claims of Sex Discrimination.

Callanan alleges that the Defendant discriminated against her, on the basis of her sex, by creating and maintaining a work environment that was hostile to her, and by denying her conditions of employment that were as favorable as those extended to her male co-employees. The Defendant responds to these claims by denying that any discriminatory conduct occurred, as a matter of law. We examine each of Callanan's claims under the standards recently reiterated by the United States Supreme Court.

### a. Callanan's Sexual Harassment Claim.

■ We have attempted to fully catalog the work-related incidents which Callanan has related as being abusive to her. In doing so, we recognize that the individualized instances of perceived abuse may aggregate so that the composited experience, to which Callanan was exposed, is greater than the sum of its segmented parts. Here, Callanan does not allege any "quid pro quo" harassment, but asserts that the Defendant's work-

---

**20.** We acknowledge that the Supreme Court was not confronted with the intricacies of federalism in the *Brown* case, but we do not see that distinction as producing a different result here. If each of the State and local governmental agencies, which monitor employment practices, may initiate procedures that expand, diminish or otherwise modify those of Section 2000e–16, the capability of the Federal Government to responsibly management its own employment affairs will, inevitably, be jeopardized. Certainly, multi-State corporations may be confronted with some of the same perils, but such business entities have no pretense, nor any expectation, of self-governance.

**21.** Since the issue is not properly before us, we do not address the extent to which any recovery under Title VII may be offset by FECA benefits which have been awarded for the same physical or mental condition which is claimed to have been suffered as a result of the Title VII violation.

place was so permeated with discriminatory intimidation, ridicule and insult that it altered the conditions of her employment in violation of Title VII. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

 Of course, what constitutes abuse in the workplace, which is sufficiently severe or pervasive to violate Title VII, is not reducible to a "mathematically precise test." *Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The test we apply, however, was recently enunciated by the Supreme Court in *Harris v. Forklift Systems, Inc.,* supra, as follows:

> * * * [W]e can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.*

 As a consequence, the determination of a hostile or abusive work environment has both an objective and a subjective component. Again, as stated by the Court in *Harris:*

> As we pointed out in *Meritor,* "mere utterance of an ... epithet which engenders offensive feelings in a[sic] employee," * * * does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.*

With these guideposts in mind, we examine the conduct which Callanan has isolated as being abusive, threatening and humiliating taking, as we must, a view of the evidence in a manner that is most favorable to Callanan.

Of the conduct that Callanan found objectionable, the "worst," by her appraisal, involved a two-to-three minute telephone call that she had received from Beahm on August 18, 1990. According to Callanan, Beahm had identified himself during the course of the call which, she felt, had been generated by her successful displacement of Beahm from a job assignment because of her superior seniority rights. Although Beahm has repeatedly denied any involvement in the telephone call, Callanan has described the contents of the call as follows:

> He called me on August 18, 1990 which is the date of injury on the workmen's comp claim and told me if I messed with the schedule anymore, I would be sorry; that I was going to get my ass chewed; that he talked to Larry and Terry [i.e., Callanan's immediate supervisors] about it. It was just a real scary call. He said I was going to get my ass chewed.

Callanan Deposition, at p. 85.

Following Callanan's report of the incident to Kirschbaum, Beahm was interviewed to determine his complicity in the event, and Beahm submitted both an oral and a written denial. While Callanan believes that a lie detector test should have been administered in order to ascertain the truth, the record does reflect that Callanan reported no subsequent, threatening calls to her employer.

On one occasion, ostensibly at some time before Callanan was cited in March of 1990, for having left her postal vehicle unlocked, a fellow employee had called her a "bitch." The record is uncontested, however, that the employee was spoken to by postal management, and there is no showing that the epithet was ever repeated. We understand that Callanan was also referred to as "Missy," but there is no evidence in this record who was making the reference or to whom, if anyone,

Callanan reported the name-calling. We are also aware that, in February of 1990, Callanan's immediate supervisor informed her, in the presence of her co-workers, that she had committed "unprofessional" conduct on that date, but Callanan could not recall what conduct provoked her supervisor's comment. Additionally, there was also a rumor circulating that Callanan and a former supervisor of her's were having an affair. According to Callanan, however, she had not learned of the rumor until her former supervisor had informed her about it. The same supervisor demanded and received a conference with Kirschbaum, and with certain of his co-workers, in order to put the rumor to rest. On the basis of the record before us, the conference was successful.

In addition to the foregoing, there is evidence that a poster was hung in the workplace that was not complimentary of Callanan, but there is no evidence that Callanan viewed the poster or, for that matter, what was contained on the poster which was offensive. There is also evidence before us that, on two occasions—one in 1989, and the other in 1993—the Plaintiff received subscriptions to Penthouse magazine that were unwanted and were discontinued by her. She suspects that someone at the Mankato Post Office was responsible for ordering the subscriptions, but she has not corroborated her suspicions with any supportive evidence.

■ At the close of her deposition testimony, Callanan responded to her counsel's request for any other incidents of abuse by advising, apparently for the first time, that Beahm had "grabbed [her] butt" while she was walking on some stairs and that her co-workers had continuously commented "nice butt," when she walked through their work area. When asked why she had not included these incidents in her complaint to the EEOC, Callanan responded that, at the time, she only reported those incidents which were "important to [her] and which affected [her] job and performance." Callanan Deposition. at p. 158. Callanan felt that these incidents had "bothered" her, but "in the big total picture, it's the other stuff that was affecting [her] job; the hours, the routes." Id. Accordingly, while the events may have been offensive, they did not pass the subjective test of *Hicks,* by altering her ability to perform her work, when viewed in the global setting of her sex discrimination claims. See, *Harris v. Forklift Systems. Inc.,* supra at ——, 114 S.Ct. at 369. Since Callanan did not subjectively perceive this conduct as affecting her "job and performance," the conduct could not have "actually altered the conditions of her employment." *Id.*

And, lastly, sometime in 1991, while Callanan was working alone, she observed two "pornographic" photographs which were displayed in her work area, and which she felt were directed at her. Upon observing the photographs, Callanan contacted a female supervisor in a different department who removed the photographs from Callanan's view.

■ Both individually and in their combined effect, we recognize that these events could be emotionally upsetting. We neither condone nor trivialize them. Nevertheless, the events were transitory, were corrected when brought to the attention of postal management, and were, by all accounts, short-lived. When viewed in the context of the two-year period in which these events occurred, it may not be legitimately said that the objectionable conduct permeated the workplace, or was so serious or pervasive as would draw a reasonable person to conclude that the work environment to which Callanan was exposed was hostile or abusive. While not unmindful that the conduct in question need not be explicitly sexual in nature, the conduct must, nonetheless, be sufficiently patterned or pervasive to be actionable as a hostile environment claim. *Kopp v. Samaritan Health System, Inc.,* 13 F.3d 264, 269 (8th Cir.1993), citing *Hall v. Gus Construction Co., Inc.,* 842 F.2d 1010, 1014 (8th Cir. 1988). Here, we find no such patterned or pervasive practice.

■ We accept that Callanan believes that some of the conduct contributed to a deterioration in her work performance and that, unqualifiedly, she has sustained a workplace injury, in the nature of stress, that requires psychological care. On this record, however, we may not reasonably infer that the conduct she has related would, on an

objective basis, precipitate the type of injury that she has claimed. Were our analysis driven solely by the subjective standard of a claimant's reaction to workplace conduct, we would be compelled to place principal reliance upon her on-the-job injury.[22] The Supreme Court, however, has precluded our sole reliance upon "psychological harm" as the determinant factor and, given the record before us, we are unable to conclude that the conduct involved here, which was not frequent, severe, physically threatening or humiliating, rises to the level of an abusive or hostile environment. We add what should appear self-obvious; both at her deposition and in her filings on this Motion, Callanan was afforded a full opportunity to exhaustively detail each and every incident which she believes would persuade a reasonable person that an objectively hostile or abusive work environment was at hand. Accordingly, we are satisfied that the actions and statements which Callanan has isolated for our review comprise the entirety of the behavior that she regards as violative of Title VII.

■ For the reasons stated, we disagree and, therefore, we recommend that Judgment be entered in' favor of the Defendant on Callanan's sexual harassment claim. In doing so, we acknowledge that a Summary Judgment in an employment discrimination claim should be seldom granted, but where, as here, the claimant has failed to establish a factual dispute on each element of her prima facie showing, Summary Judgment is appropriate. *Sweeney v. City of Ladue*, 25 F.3d 702, 703, citing *Weber v. American Express Co.*, 994 F.2d 513, 515 (8th Cir.1993).

### b. Callanan's Disparate Treatment Claim.

■ Callanan contends that she and her female co-workers were denied favorable hours, routes and job assignments which were offered to male employees. She further contends that personal leave was denied to her but was granted to her male counterparts, and that she was subject to disparate, and unfavorable, discipline than that which was accorded to male employees. Although, on this record, we find her disparate treatment claims to be attenuated, we are unable to conclude that an entry of Judgment, as a matter of law, is warranted in view of the genuine issues of material fact which infuse these issues.

■ In urging the entry of Summary Judgment, the Defendant argues that Callanan has failed to proffer evidence of the Defendant's discriminatory purpose or motive and that, as a consequence of the Supreme Court's holding in *St. Mary's Honor Center v. Hicks*, —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), any other issues of fact are rendered non-material. We think the Defendant reads too much into the *Hicks* decision. There, the Supreme Court

---

**22.** We would note, however, that the medical evidence before us does not suggest that Callanan's work-related injury of emotional stress was attributable to any of the conduct that she has identified as sexually harassing. In the words of her treating psychologist: From the time I have treated Rhonda for extreme stress reaction with a diagnosis of Post Traumatic Stress Disorder, I have seen many symptoms of that disorder which have caused me concern. These appear clearly associated with her work environment where difficulties developed to such an extent that there is a very definite adversarial relationship between herself and her supervisors.

＊　＊　＊　＊　＊　＊

In view of what I have observed over these months of providing treatment to Rhonda, it is my opinion that the conflict that exists between Rhonda and the significant personnel and supervisors of the Mankato Post Office is irresolvable. Because she is an individual at odds with an organization, she is not psychologically or physically able to handle the ongoing stress. Notably, Callanan had two immediate supervisors, one male and one female and, with the exception of one of them having advised Callanan that she had engaged in "unprofessional conduct" on one instance, her hostile or abusive environment claims are not directed against them. Moreover, as her psychologist observed, Callanan's state of distress continued "even when she was working in a setting apart from the people with whom she had her greatest difficulty." We would also note that, years prior to her employment with the Postal Service, Callanan was treated by mental health consultants for "bad problems with depression," that she attributed to the birth of her first child, and for which she was hospitalized. Callanan Deposition, at p. 20–22. Although the Defendant intimates that the birth of Callanan's second child, just before her employment with the Postal Service, has some impact on her psychological claims, we do not reach that issue, as the record is devoid of any medical evidence which causally relates Callanan's emotional distress to sexual harassment.

determined that the Court could reject the employer's reasons for its employment decisions as pretextual, but could, nonetheless, deny relief to the Plaintiff if the Court concluded that the employment decision was not provoked by a discriminatory intent. While the Court concluded that the factfinder's disbelief of the reasons advanced by the employer, "particularly if [the] disbelief were accompanied by a suspicion of mendacity," could suffice to show intentional discrimination if that evidence were coupled with the elements of a prima facie case, we do not read *Hicks* as requiring the Plaintiff to provide evidence of "mendacity" in order to withstand a Motion for Summary Judgment. Id. at ——, 113 S.Ct. at 2749.

Here, the Defendant has not offered the usual Rule 56 showings, whether by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that Callanan's complaints of disparate treatment are ill-founded. Absent such a showing, we take the complaints—in a light most favorable to Callanan as raising genuine issues of material fact. As a consequence, we recommend that the Defendant's Motion for Summary Judgment on Callanan's disparate treatment claims be denied.

4. Callanan's Retaliation Claim.

■■■ Callanan contends that the Defendant violated the anti-retaliation provisions of Title VII. Title 42 U.S.C. 2000e–16(d). Under Title VII, the Plaintiff must prove a prima facie case of retaliation by demonstrating:

(1) that she engaged in a protected activity;

(2) that an adverse employment action occurred; and

(3) that a causal connection is established between the two.

*Sweeney v. City of Ladue,* supra 25 F.3d at 703 (8th Cir.1994), citing *Sherpell v. Humnoke School Dist. No. 5,* 874 F.2d 536, 540 (8th Cir.1989); *Marzec v. Marsh,* 990 F.2d 393, 396 (8th Cir.1993).

Of course, under Title VII the filing of an EEOC Complaint is a statutorily protected activity. Therefore, our analysis focuses on the second element of a prima facie case, namely, whether Callanan was the victim of an adverse employment action. Classic examples of adverse employment actions under Title VII include an employer's discharge, a failure to promote, or a failure to hire an employee because of a statutorily protected activity in which the employee had engaged.

■■■ Here, Callanan alleges that the adverse employment actions were her discovery of the two pornographic photographs and management's reputed failure to investigate the circumstances that surrounded the placement of those photographs in an area in which Callanan would be expected to discover them. We do not read the predicate element of an "adverse employment action" as including any occurrence in the workplace with which a plaintiff may disagree. The record is undisputed that the incident involving the photographs was a singular occurrence and, while there is no evidence that management conducted an investigation as to its genesis, there is also not the slightest evidence that the incident was precipitated by Callanan's filing of an EEOC charge. Under Title VII, a plaintiff's failure to create a showing that the employer had taken any adverse employment action against her constitutes a failure to create a prima facie case which, thereby, warrants the entry of a Summary Judgment. *Evans v. T.W. Serv., Inc.,* 930 F.2d 612, 614–15 (8th Cir.1991).;[23]

NOW, THEREFORE, It is—

ORDERED:

---

**23.** Even if Callanan had relied upon the failure of the Defendant to create a light-duty job, which would not require her to work longer than 20 hours, as her adverse employment action, the record before us demonstrates that such employment was inconsistent with her treating psychologist's recommendation that she seek alternative employment so as to avoid the emotional stresses that he had diagnosed. Indeed, the Defendant had prescribed light-duty work, which was limited to 36 hours per week, consistent with Callanan's request for less strenuous employment in an atmosphere removed from her co-workers. We do not view such a response to her employment requests, which post-dated her filing of her original EEOC charge, as being acts of reprisal or retaliation.

That the Defendant's Motion to Strike the Plaintiff's Request for a Jury Trial and for Compensatory Damages [Docket No. 18] be GRANTED.

AND, It is—

RECOMMENDED:

That the Defendant's Motion for Summary Judgment [Docket No. 20] be granted with respect to the Plaintiff's hostile environment and retaliation claims, but be denied with respect to her disparate treatment claim.

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D.Minn. LR1.1(f), and D.Minn. LR72. 1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than August 10, 1994, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than August 10, 1994, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.

\* \* \*

In sum, the legislative history of § 717 discloses a clear intent to provide federal employees with rights that parallel those available to employees in the private sector, no evidence of an intention to make the remedy exclusive, and the rejection of an amendment which would have so provided.